UNITED STATES DISTRICT COURT

DISTRICT OF MAINE

| | |
|---|---|
| UNITED STATES, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | 1:15-cr-00041-JAW-2 |
| ) | |
| TIFFANY SUTHERLAND, ) | |
| ) | |
| Defendant ) | |

**RECOMMENDED DECISION ON MOTION TO SUPPRESS**

This matter is before the Court on Defendant's motion to suppress (ECF No. 62).[1] Through her motion, Defendant seeks to exclude from trial evidence secured by law enforcement during multiple searches conducted on October 30, 2014.

Defendant asks the Court to exclude evidence obtained pursuant to a search warrant authorized by a state court judge. Defendant also challenges two searches that the Government maintains were conducted based on the consent of the property owner.[2] An evidentiary hearing was conducted on the consent issue.

## DISCUSSION

**A.    Defendant's Challenge to Probable Cause Finding**

Pursuant to a search warrant authorized by a state court judge, on October 30, 2014, law enforcement conducted a search of room 145 of the Days Inn located at 250 Odlin Road in Bangor,

---

[1] The Court referred the motion.

[2] Defendant was not the property owner. The Government, however, does not challenge Defendant's standing to contest the validity of the search of Tracy Luke's home. To the extent that standing was an issue, Ms. Luke's testimony established that Defendant was an overnight guest in Ms. Luke's home with a "legitimate expectation of privacy in the invaded place." *Rakas v. Illinois*, 439 U.S. 128, 143 (1978).

Maine. Defendant contends that the affidavit upon which law enforcement relied to secure the search warrant lacked probable cause.

According to the affidavit, near midnight on October 29, 2014, a Bangor police officer observed a vehicle with no license plate enter the parking lot of the Riverview Motel, remain in the parking lot for approximately five minutes, and then leave. The officer subsequently stopped the vehicle based on the absence of a license plate. During the stop, the officer learned that the driver of the vehicle was Timothy Thorpe and that Mr. Thorpe was in the process of driving to the Days Inn to drop off his passenger, Terrance Douglas.

To the officer, Mr. Thorpe appeared to be nervous and shaking. Mr. Thorpe also did not look the officer in the eye when the officer spoke with him. Because the officer was suspicious of Mr. Thorpe's conduct, the officer asked Mr. Thorpe to exit the vehicle. Mr. Thorpe complied. Upon questioning, Mr. Thorpe reported that he had gone to the Riverview Motel to look for his girlfriend, that he did not purchase drugs at the motel, and that he did not have anything illegal on his person or in his vehicle.

The officer also spoke with the passenger, Mr. Douglas. Mr. Douglas asserted that he was in town for a few days, that he was trying to locate his girlfriend, and that he was simply getting a ride back to his hotel. Mr. Douglas also represented that he did not have anything illegal on him or in the vehicle.

When the officer questioned Mr. Thorpe further, he asked Mr. Thorpe if he would consent to a search of his person. Mr. Thorpe granted his consent. During the search, the officer found a white rock substance in a pocket of Mr. Thorpe's pants, which substance Mr. Thorpe identified as crack cocaine. The officer also found a similar substance in Mr. Thorpe's jacket.

2

At one point during the stop, the officer requested the assistance of another officer. Upon detecting the suspected drugs on Mr. Thorpe, the additional officer removed Mr. Douglas from the vehicle, and searched him. The search revealed two room keys for the Days Inn, several miscellaneous keys, and $1,700 cash.

The officers requested the assistance of a state police K-9 in connection with the search of the vehicle. When law enforcement explained the process to Mr. Douglas, Mr. Douglas again denied that he possessed any drugs. When the K-9 indicated that Mr. Douglas might have drugs on his person, Mr. Douglas attempted to flee. He was quickly apprehended. When searched, Mr. Douglas was found to be in the possession of marijuana, which was placed in an area designed to avoid detection. Law enforcement arrested Mr. Douglas for refusing to submit to arrest.

As part of the subsequent investigation, law enforcement learned from the desk clerk at Days Inn that Mr. Douglas was the registered resident of room 145 of the hotel. When the clerk related this information, the clerk also told law enforcement that a woman was currently at the front desk demanding a key to the safe in room 145.

Law enforcement then went to the hotel, and knocked on the door to room 145. No one came to the door or otherwise answered the knock. One law enforcement officer observed Defendant enter the hotel. When Defendant stated that she wanted to get her property from room 145, law enforcement told her that the room was to be secured for a search warrant. Defendant left the premises. When law enforcement entered the room to secure it, no one was located in the room.

In the early morning hours of October 30, Defendant appeared at the Penobscot County Jail to get a key from Mr. Douglas. Law enforcement refused to allow Defendant to obtain the key, and law enforcement took possession of the key.

The affidavit also reflects that law enforcement was aware that two weeks earlier, on October 16, a search of a room at a nearby motel on the Odlin Road revealed 66 grams of suspected crack cocaine, miscellaneous drug paraphernalia, approximately $12,500 in cash, and receipts in Defendant's name.  Mr. Douglas has an extensive history of drug distribution and possession.  In addition, Defendant and Mr. Thorpe each have a prior conviction for unlawful trafficking in scheduled drugs.

The Fourth Amendment provides that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV.  To satisfy the Constitution, an application for a search warrant must demonstrate probable cause to believe (1) that a crime has been committed (the "commission" element) and (2) that the place to be searched contains evidence of the crime (the "nexus" element). *United States v. Cordero-Rosario*, 786 F.3d 64, 69 (1st Cir. 2015) (quotation marks omitted).  "The task of the issuing magistrate is ... to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, ... there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates,* 462 U.S. 213, 238 (1983).  When reviewing a magistrate's probable cause finding, the reviewing court gives "significant deference" to the magistrate's initial evaluation and relief is warranted only if there is no substantial basis for the probable cause finding. *Cordero-Rosario*, 786 F.3d at 69 (quotation marks omitted).  Probable cause is assessed in light of the totality of the circumstances contained in the search warrant affidavit, and is to be evaluated in light of "the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." *Gates*, 462 U.S. at 230 – 31 (quoting *Brinegar v. United States*, 338 U.S. 160, 175-76 (1949)).

As to the nexus finding, the nature of the crime under investigation is an important consideration. *Cordero-Rosario*, 786 F.3d at 69. The affidavit in support of the search warrant application must connect, with more than a conclusory assertion of suspicion, the location of the proposed search to the subject crime. *Id.* at 71. In other words, the affidavit must supply sufficient facts to permit the reviewing judicial officer to find probable cause that a nexus exists between the crime under investigation and the location to be searched. *Id.* at 71 – 72.

In this case, the Government maintains that the circumstances described in the affidavit establish probable cause to believe that Mr. Douglas was engaged in the sale of crack cocaine, that Defendant resided in the same room as Mr. Douglas, that Defendant was involved in the crack cocaine trade, and that evidence of the distribution of crack cocaine could be found in the Days Inn room. (Gov. Opposition, ECF No. 62-1, p. 8.) After setting forth the circumstances that he believed justified the issuance of the search warrant, in the affidavit, the affiant asserted, "[b]ased on the above described information, there is probable cause to believe [that] room 145 at the Days Inn in Bangor contains drugs, drug proceeds, drug paraphernalia, record/documents related to the importation and/or sale of illegal drugs." (Def. Exh. 1, Affidavit and Request for Search Warrant, ¶ 11, ECF No. 64-1, p. 8.) The Government, therefore, argues that the reviewing judge had sufficient facts to find probable cause to believe that Mr. Douglas was involved in the sale and distribution of crack cocaine, and that evidence of the crime was present in room 145 of the Days Inn.

That Mr. Douglas possessed a modest amount of marijuana, had $1,700 in cash, and attempted to flee, two room keys for the Days Inn, together with the presence of crack cocaine on Mr. Thorpe's person, might not establish a sufficient nexus between the alleged crime and room 145. The affidavit, however, is not limited to the circumstances of and the information learned

during the stop of the vehicle. Rather, the affidavit also includes information regarding Defendant's activities before and on October 30, the principals' drug-related criminal histories, information provided by the clerk of Days Inn, and Defendant's connection with recent drug activity in a nearby hotel. The issue is whether all of the circumstances constitute probable cause to search room 145.

Preliminarily, the past illegal drug activity of Defendant, Mr. Douglas and Mr. Thorpe, while not dispositive, is a relevant factor to a probable cause determination regarding Mr. Douglas's involvement in illegal drug-related conduct on October 30, 2014. Indeed, Mr. Douglas's and Mr. Thorpe's possession of illegal drugs and significant amounts of cash is consistent with drug activity that appears similar to the conduct for which they were previously convicted.

More importantly to the nexus analysis, the fact that room 145 was registered to Mr. Douglas, Defendant's apparent connection to recent drug activity in a nearby hotel, and Defendant's persistent, and arguably desperate efforts to retrieve property located in a safe in room 145 immediately upon Mr. Douglas's arrest, provide the necessary nexus between the suspected crime (possession/distribution of drugs) and the location of the search. In other words, one can reasonably conclude from the affidavit that Defendant, Mr. Thorpe and Mr. Douglas were involved in illegal drug activity, and that upon Mr. Douglas's arrest, Defendant urgently attempted to remove evidence of the activity from the safe in room 145. Because the affidavit establishes probable cause to believe (a) that a crime was committed and (b) that room 145 of the Days Inn contained evidence of the crime, Defendant's challenge to the sufficiency of the search warrant fails.[3]

---

[3] Even if the affidavit were deemed deficient in some way, suppression of the evidence would not be warranted. The exclusionary rule does not automatically apply with respect to evidence seized pursuant to an invalid search warrant.

B.    **Consent to Search**

### Proposed Findings of Fact

Based on the evidence presented at the hearing on Defendant's motion challenging the search of the property of Tracy Luke, which property is located in Winterport, Maine,[4] I recommend that the Court find the following facts:

1. As of October 30, 2014, Defendant had known Tracy Luke for nine years.

2. On October 30, 2014, Defendant contacted Ms. Luke by telephone, and asked if she and her boyfriend, Douglas, whom Ms. Luke knew as Ray, could stay at Ms. Luke's home, which was a mobile home.

3. Soon after Defendant arrived at Ms. Luke's residence, Defendant used the shower.

4. While Defendant was in the shower, four law enforcement officers arrived at Ms. Luke's home.

5. Two officers approached the home; one officer went to Ms. Luke's front door, and another went to the rear of the home. The officer who went to the rear of the home eventually joined the officer at the front of the home.

6. Ms. Luke met the officer outside the door. Initially, the officer asked if Defendant was present. Ms. Luke said that she was, and stepped aside when the officer said he wanted to talk with her. When Defendant appeared, law enforcement placed her under arrest.

---

Under the good faith exception, "evidence from an illegal search need not be suppressed if the police officer who conducted the search 'acted in objectively reasonable reliance on a search warrant, issued by a neutral and detached Magistrate, that later was determined to be invalid.'" *Cordero-Rosario*, 786 F.3d at 72 (quoting *Arizona v. Evans,* 514 U.S. 1, 11 (1995)). In accordance with the good faith exception, "evidence will be suppressed only when the police conduct is 'sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the justice system.'" *United States v. Echevarría-Ríos*, 746 F.3d 39, 41 (1st Cir. 2014) (quoting *Herring v. United States,* 555 U.S. 135, 144 (2009)). In this case, the factors cited herein as support for a probable cause finding would, at a minimum, support application of the good faith exception.

[4] At the hearing, the parties presented several exhibits, and the testimony of Tracy Luke, Special Agent Christopher Gardner of the Maine Drug Enforcement Agency, and Officer Joseph Burke of the Hampden Police Department.

7. Law enforcement then began to secure the home in anticipation of obtaining a search warrant. One of the officers explained the process to Ms. Luke, who asked a number of questions about the process. Because Ms. Luke has children, she asked whether law enforcement was going to call DHS. She was also concerned that the situation would disrupt the mobile home park in which she resided.

8. During the conversation, Ms. Luke said that a warrant was not necessary. She said that she would consent to the search as she wanted to demonstrate that she had nothing to do with the situation.

9. Ms. Luke represented that she owned the mobile home. When law enforcement officers presented her with the consent form, she acknowledged each item and signed the form.

10. During her discussion with law enforcement, Ms. Luke was nervous and somewhat emotional.

11. After Ms. Luke executed the consent form, law enforcement conducted the search. As they conducted the search, law enforcement asked Ms. Luke to point out the items that did not belong to her. She pointed out a few items that did not belong to her. Among the items identified was a cell phone in the living room.

12. As part of the search of the kitchen of the home, law enforcement searched some plastic bags that were in the kitchen. Before law enforcement searched the bags, Ms. Luke did not advise law enforcement that the bags were not her property.

13. Ms. Luke was present when law enforcement searched the bags in the kitchen. Law enforcement found drugs in one of the bags.

14. When law enforcement announced that one of the bags contained drugs, Ms. Luke said that the drugs did not belong to her.

"[O]ne of the specifically established exceptions to the requirements of both a warrant and probable cause is a search that is conducted pursuant to consent." *Schneckloth v. Bustamonte,* 412 U.S. 218, 219 (1973); *see also United States v. Brake*, 666 F.3d 800, 806-07 (1st Cir. 2011) (involving search of a bag); *United States v. Jones*, 523 F.3d 31, 37 (1st Cir. 2008) (involving search of premises). "In order for consent to be valid, the Government must prove by a preponderance of the evidence that the consenting party gave it freely and voluntarily." *Jones*, 523 F.3d at 37. This turns on the totality of the circumstances involved in the interaction between the investigating officers and the consenting party. *Id.* Where consent is freely and voluntarily given, the scope of the consent remains an issue; a warrantless consent search may not exceed the scope of the consent communicated by the consenting party. *United States v. Chaney*, 647 F.3d 401, 406 (1st Cir. 2011). The scope of consent is measured by an objective standard, *i.e.*, what "the typical reasonable person [would] have understood by the exchange between the officer and the suspect." *Florida v. Jimeno,* 500 U.S. 248, 251 (1991).

Defendant contends that Ms. Luke did not voluntarily grant consent to the search of her home and the plastic bag in the kitchen. Defendant maintains that law enforcement pressured Ms. Luke to grant consent, and were on notice that Ms. Luke did not own the plastic bag.

Contrary to Defendant's argument, the evidence established that Ms. Luke knowingly and voluntarily consented to the search of her home. Although Ms. Luke was understandably nervous and emotional given the presence of several law enforcement officers at her home, the record lacks any evidence to support the conclusion that she was coerced or otherwise granted the consent against her will. Simply stated, the record plainly demonstrates that Ms. Luke voluntarily granted consent to law enforcement to search her home.

Defendant's argument that law enforcement improperly searched the plastic bag in the kitchen is also unpersuasive. During the search, law enforcement asked Ms. Luke to identify the items that did not belong to her. Even though Ms. Luke was in the kitchen area with law enforcement officers and identified some items in the area that did not belong to her, Ms. Luke did not identify the bag as an item that did not belong to her. She only disavowed ownership after law enforcement searched the bag and found drugs in the bag. Law enforcement was not on notice, as Defendant asserts, that Ms. Luke did not own the bag. To the contrary, given that Ms. Luke had been asked to identify items that were not hers, and given that she did not identify the bag, law enforcement could reasonably conclude that the bag belonged to Ms. Luke and that the authorized search included the bag. *See United States v. Marshall*, 348 F.3d 281, 287-88 (1st Cir. 2003) ("where consent is given and is reasonably understood to extend to a particular item, the Fourth Amendment does not require a more explicit authorization.")

Finally, to the extent that Defendant contends that law enforcement was not authorized to look into the bag, Defendant's argument is unconvincing. "'[A] general consent to search … subsumes the specific consent to search any easily accessible containers' that may be located within the designated search area." *United States v. Stierhoff*, 549 F.3d 19, 24 (1st Cir. 2008) (quoting *United States v. Zapata*, 18 F.3d 971, 977 (1st Cir. 1994)).

## CONCLUSION

Based on the foregoing analysis, I recommend that the Court deny Defendant's Motion to Suppress.

## NOTICE

A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. 636(b)(1)(B) for which *de novo* review by the district court is sought, together with a supporting memorandum, and request for oral argument before the

district judge, if any is sought, within fourteen (14) days of being served with a copy thereof. A responsive memorandum and any request for oral argument before the district judge shall be filed within fourteen (14) days after the filing of the objection.

Failure to file a timely objection shall constitute a waiver of the right to *de novo* review by the district court and to appeal the district court's order.

/s/ John C. Nivison
U.S. Magistrate Judge

Dated this 22nd the day of July, 2015.